## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CR 24-0707 JB

PABLO RAFAEL MARTINEZ,

   Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Opposed Motion to Suppress, filed June 11, 2024 (Doc. 26)("Motion"). The Court held an evidentiary hearing on October 3, 2024. See Clerk's Minutes at 1, filed October 3, 2024 (Doc. 37). The primary issues are: (i) whether Officer Nicholas Jackson Constitutionally seizes Defendant Pablo Rafael Martinez when he orders Martinez to exit the car and stand on the side of the road; and (ii) whether Martinez' statements to Jackson when standing on the side of the road should be suppressed pursuant to Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda"). The Court concludes that: (i) Jackson does not unconstitutionally seize Martinez, because the Constitution permits law enforcement officers to order a vehicle's occupants out of the vehicle for the duration of a traffic stop; and (ii) the statements should not be suppressed, because Martinez is not in custody for Miranda purposes when he admits to Jackson he crossed the border recently and has a conviction for robbery.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its

essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)("[T]he Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).[1]

---

[1]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have

1.      In the early morning on May 31, 2023, Jackson, a federal law enforcement officer with the United States Department of the Interior, Bureau of Indian Affairs, Division of Drug Enforcement, K-9 unit, patrols Interstate 40 in his patrol car, with his police dog in the back of the car.  See Draft Transcript of Hearing at 7:10-19, taken October 3, 2024 ("Tr.")(Jackson).[2]

2.      Jackson is assigned to the United States Department of Homeland Security, Albuquerque field unit, and his task is "criminal interdiction," meaning his patrol is unrelated to any particular investigation and, instead, seeks to root out criminal activity in New Mexico.  See Tr. at 7:10-19 (Jackson).

3.      Jackson is a commissioned Cibola County Deputy Sheriff.  See Letter from Rumaldo R. Armijo to the Honorable James O. Browning at 2 (dated November 13, 2024).

4.      Around 7:00 a.m., Jackson is driving in the left lane and approaches a white Chevy Traverse driving in the right lane.  See Dashcam Footage at 00:01-00:30 (dated Mary 31, 2023), admitted into evidence on October 3, 2024, as United States' Exhibit 1 ("Dashcam"); Tr. at 9:15-16 (Court)(admitting Dashcam Footage into evidence).

_____

generally determined that citation to unpublished opinions is not favored . . . .
However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo, United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005), United States v. Reynolds, 729 Fed. App'x 639 (10th Cirl 2018), and Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

5.      As Jackson approaches the Chevy, his license-plate reader -- a fixed camera attached to his patrol car -- automatically scans the Chevy's temporary tag.  See Tr. at 14:10-17 (Jackson); 15:10-22 (Jackson); id. at 39:9-12 (Elsenheimer and Jackson).

6.      When Jackson enters the temporary tag into the NCIC database[3] in his patrol car, the database shows that the temporary tag is not associated with the Chevy.  See Tr. at 14:15-17 (Jackson).

7.      He pulls parallel to the Chevy, and notices that the car is full of people sitting or laying on top of each other.  See Tr. at 18:2-14 (Jackson).

8.      Moreover, he observes that at least some of the Chevy's occupants are not wearing their seatbelts.  See Tr. at 18:24-25 (Armijo); id. at 19:1-3 (Jackson and Armijo).

9.      At this point, Jackson stops the Chevy and decides to conduct a human smuggling investigation.  See Tr. at 13:1-10 (Jackson).

10.     He speaks to the driver, who speaks English.  See Tr. at 19:8-11 (Jackson).

11.     Jackson also speaks to Martinez, who is sitting next to the door of the rear passenger seat.  See Tr. at 20:12-18 (Armijo and Jackson).

12.     Martinez speaks English, too, which leads Jackson to suspect Martinez is a second driver in the human-smuggling operation.  See Tr. at 19:16-21 (Jackson); id. at 34:2-9 (Jackson).

13.     Next, Jackson orders the driver to exit the Chevy and stand in front of his patrol car.  See Tr. 19:22-25 (Armijo and Jackson).

14.     Once the driver exits the car, Jackson speaks with Martinez, who remains in the

---

[3]The Federal Bureau of Investigation ("FBI") launched the National Crime Information Center (NCIC) in 1967; it is "an information system that contains records contributed by and accessible to criminal justice agencies nationwide."   National Crime Information Center, FBI, https://le.fbi.gov/informational-tools/ncic (last visited October 18, 2024).

car.  See Tr. at 20:12-15 (Armijo and Jackson).

15.      Soon after, he orders Martinez to exit the Chevy, stating, "Go stand out there in the field.  And don't run off.  My dog is faster than two legs."  Dashcam at 4:29.

16.      After Martinez walks out into the field, Jackson speaks with the driver in front of his patrol car.  See Tr. at 21:6-16.

17.      Jackson asks the driver where he is traveling to, and the driver tells him he is going to Cummings, Georgia, but does not know the exact address.  See Tr. at 22:1-6 (Jackson).

18.      Jacksons also asks the driver how he is going to get to his final destination, and the driver states that he is going to receive the address upon arrival in Cummings.  See Tr. at 22:6-8 (Jackson).

19.      He then asks him who the people in the car are and what Martinez' name is, but the driver does not answer either question.  See Dashcam at 5:30-5:57.

20.      Because the driver does not tell him the names of the passengers in the Chevy, Jackson calls into dispatch and relays that "it's going to be a human trafficking load, there are several people."  Dashcam at 5:57.

21.      The driver gives Jackson a California driver's license, and Jackson verifies his identity using that license.  See Tr. at 22:24-25 (Armijo); id. at 23:1-8 (Jackson and Armijo).

22.      Jackson asks to see the driver's phone, which has the navigation application Google Maps open, and sees that the destination in the application is the city of Cummings, Georgia, rather than a physical address in Cummings.  See Tr. at 23:20-25 (Jackson); id. at 24:1-5 (Jackson).

23.      Jackson instructs the driver to place his phone on the hood of the patrol car, and discovers the driver has two cellular telephones.  See Dashcam at 8:10.

24.      He then tells the driver to go stand in the field by the side of the highway.  See

Dashcam at 8:35.

25.    Jackson beckons Martinez over to his patrol car to speak with him.  Dashcam at 8:40.

26.    Jackson asks Martinez who owns the car.  See Dashcam at 9:12.

27.    Martinez says the car belongs to the driver, but Jackson challenges him, saying: "You sure it's his car? He said it's not his car."  Dashcam at 9:18-20.

28.    Martinez responds: "I don't know."  Dashcam at 9:20.

29.    Undeterred, Jackson asks Martinez for his last name; Martinez tells him his name is "Benjamin."  Dashcam at 9:27.

30.    He begins to spell it, but stops, asking: "You mean my last name?"  Dashcam at 9:27-39.

31.    Jackson, displeased, informs him: "The fact that you can't even spell your last name to me? You're probably lying.  And if you're lying about your name, that's concealing identity, and you will be arrested."  Dashcam at 9:45.

32.    Martinez agrees to give his name, and after a few false starts, spells out his last name, "Morillo," and gives his first name as "Benjamin."  Dashcam at 10:20-29.

33.    Responding once more to Jackson, Martinez asserts that he has a New York driver's license.  See Dashcam at 10:50.

34.    Next, Jackson tries to untangle the relationships between the driver and the passengers, asking Martinez how he knows the driver.  See Dashcam at 10:58.

35.    Martinez takes another detour and explains that he met a woman in the Chevy through a dating website.  See Dashcam at 11:00.

36.    Jackson interrupts, declaring that the woman is not Martinez' girlfriend and asking

him again how he knows the driver.  See Dashcam at 11:16.

37.    Martinez responds vaguely: "At the place where I met her," gesturing towards the Chevy.  Dashcam at 11:30.

38.    Dissatisfied, Jackson reminds Martinez that he is a federal officer, and lying to Jackson is a crime; cowed, Martinez admits that the woman is not his girlfriend.  See Dashcam at 11:51.

39.    The conversation progresses: Jacksons asks Martinez his date of birth, which he gives.  Dashcam at 2:03.

40.     Then, Jackson asks Martinez whether he is from New York or from another country.  Dashcam at 12:15.

41.    At first, Martinez says that he is from New York, but he corrects himself and says that he is from Puerto Rico.  See Dashcam at 12:29.

42.    "I'm not a criminal," declares Martinez; Jackson chuckles in response.  Dashcam at 12:32.

43.    After asking for Martinez' name again, Jackson asks where he started his drive; "Arizona," says Martinez.  Dashcam at 13:15.

44.    Martinez claims he flew out to Tucson three days ago.  See Dashcam at 13:20.

45.     Martinez admits, moreover, that he does not know anyone in the car, see Dashcam at 13:45, and says that he does not know how to drive, see Dashcam at 14:07.

46.    Jackson presses for more details and asks why Martinez is traveling with eleven strangers, but all Martinez says is: "I don't know what the f**k is going on."  Dashcam at 14:10.

47.     Jackson again accuses him of helping drive the car for money, see Dashcam at 14:15, and warns him: "Your name doesn't come back on file, man, so what's going to happen,

I'm going to arrest you." Dashcam at 14:42.

48.    Fifteen minutes have passed since Jackson stopped the car, and he is losing patience; he instructs Martinez once more to give him his name and date of birth, and then asks him insistently, "Did you just cross into the U.S.?  Did you just cross back into the U.S.?  Did you just cross into the U.S.?"  Dashcam at 15:08.

49.     Martinez, his composure shot, admits that he crossed into the country four days ago without speaking to Border Patrol or Customs.  See Dashcam at 15:27-34.

50.    "What did you get deported for," asks Jackson, to which Martinez responds reluctantly: "Robbery."  Dashcam at 15:40-16:05.

51.     From here, it is game over for Martinez; he gives Jackson his real first name, Pablo, and admits he paid $12,000.00 to get back into the country.  See Dashcam at 17:42.

52.    Soon after, Jackson arrests Martinez and puts him in his patrol car.  See Dashcam at 18:19.

53.    Over the course of the next several minutes, Jackson takes pictures of the other passengers in the Chevy, along with the Chevy's temporary tag, warns the driver that what he is doing is illegal, and allows the driver and the passengers to continue on their way.  See Dashcam at 18:20-27:00.

54.    Throughout the traffic stop and Martinez' subsequent arrest, the police dog remains in the patrol car.  See Dashcam at 00:00-27:00.

## PROCEDURAL HISTORY

The United States charges Martinez with one count of unlawful reentry pursuant to 8 U.S.C. § 1326 (a) and (b).  See Criminal Complaint, filed May 31, 2023 (Doc. 2)("Complaint"). Subsequently, the Grand Jury returns a true bill charging Martinez with one count of the same

offense.  <u>See</u> Indictment, filed May 29, 2024 (Doc. 20).  In Martinez' Motion, he asks the Court to "suppress all physical evidence seized from him, all custodial statements elicited from him, and the fingerprints and A-File obtained from him following his arrest," because this evidence "was only discovered after an unlawful, unduly prolonged detention that lacked reasonable suspicion," in violation of the Fourth Amendment of the United States Constitution.  Motion at 1.  Martinez contends that Jackson seizes him when he orders him to exit the Chevy and stand in the field, and this seizure is unconstitutional because it lacks reasonable suspicion.  <u>See</u> Motion at 4.  The United States responds that Jackson Constitutionally prolongs the traffic stop because he has reasonable suspicion that the Chevy driver is engaging in human smuggling.  <u>See</u> Response at 9-10. Moreover, the United States asserts that the "investigatory detention of Defendant did not rise to the level of a formal arrest," because Martinez is, before his arrest, outside the patrol car standing in the field.  Motion at 11.  The United States concedes, however, that Martinez is not free to leave during his conversation with Jackson, but concludes that Jackson need not have read him his <u>Miranda</u> rights.  <u>See</u> Motion at 12.

At the hearing, Martinez argues that, when Jackson warns him that his dog runs faster than two legs, the encounter rises to "the level of arrest" and triggers <u>Miranda</u> warnings.  Tr. at 49:1-9 (Elsenheimer).  He also contends that Jackson's questioning exceeds the "permissible scope of the original traffic stop without sufficient probable cause."  Tr. at 51:1-4 (Elsenheimer).  He clarifies further that "the duration of the stop is prolonged as it pertains to Martinez."  Tr. at 52:10-15 (Elsenheimer).  The United States argues that there is probable cause to stop the vehicle, because Jackson sees some occupants do not have seatbelts fastened.  <u>See</u> Tr. at 55:20-25 (Armijo).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

The Supreme Court has long held that the Fourth Amendment "protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). A "search" generally occurs when an individual "'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,'" but an official intrudes into that private sphere. Carpenter v. United States, 585 U.S. 296, 296 (2018)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). See United States v. Dahda, 2021 WL 1712570, at * 6 (10th Cir. 2021 April 30, 2021)( "The 'basic purpose' of the Amendment 'is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials.' (quoting Carpenter v. United States, 585 U.S. 296, 303)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate

touchstone of the Fourth Amendment is 'reasonableness.'")(quoting <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (1978)).  The Supreme Court has stated, that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    <u>United States v. Jones</u>.

The defendant in <u>United States v. Jones</u> is suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtain a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System ("GPS") device to the defendant's car.  <u>See United States v. Jones</u>, 565 U.S. at 402.  On the eleventh day, task force agents attach the GPS device to the bottom of the defendant's car while the car is in Maryland.  <u>See United States v. Jones</u>, 565 U.S. at 402.  The agents then use the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  <u>See United States v. Jones</u>, 565 U.S. at 402.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor join, holds that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  <u>United States v. Jones</u>, 565 U.S. at 404.  Justice Scalia reasons that the United States' conduct is a Fourth Amendment search, because the United States trespassed on a Constitutionally protected area.  <u>See United States v. Jones</u>, 565 U.S. at 404 ("The Fourth Amendment provides . . . that '[t]he right of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated.'  It is beyond dispute that a vehicle is an 'effect' as that term is used in the

Amendment.").  Such a physical intrusion, Justice Scalia opines, would have come within the

Framers' intended definition of a "search":

> it is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.

United States v. Jones, 565 U.S. at 404-05.  Justice Scalia reconciles the Supreme Court's

conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment

search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concludes that

a visual examination of the outside of a vehicle while in plain view does not constitute a search,

by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference,

for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute

a search."  United States v. Jones, 565 U.S. at 410.

Justice Scalia reasons that the Fourth Amendment's text supports taking a property-law-

based approach to determine whether there is a search, but did not shy away from the fact that, in

recent history, the Supreme Court has deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . . Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

United States v. Jones, 565 U.S. at 406.  The United States contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all."  United States v. Jones, 565 U.S. at 406 (internal quote has no citation).  Justice Scalia concludes, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposes of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  Kyllo[ v. United States, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates.  Katz did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between *other* people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded."  Alderman v. United States, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ."  Id., at 180.

United States v. Jones, 565 U.S. at 408 (footnotes omitted).

### 2.  **Florida v. Jardines**.

In Florida v. Jardines, 569 U.S. 1 (2013), Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 569 U.S. at 11.  Justices Thomas, Ginsburg, Sotomayor, and Kagan join Justice Scalia's majority

opinion in Florida v. Jardines.  The Honorable Elena Kagan, Associate Justice of the Supreme

Court, files a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding

"further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e]

easy' twice over," but "join[ing] the Court's opinion in full."  569 U.S. at 16 (Kagan, J.,

concurring).  Justice Alito dissents, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer

join his opinion.

In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug

Enforcement Administration receive a tip that the defendant Jardines is growing marijuana in his

home, and then send a surveillance team to Jardines' home.  See Florida v. Jardines, 569 U.S. at

3.  Observing nothing of note in the first fifteen minutes watching the home, two detectives

approach the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several

other drugs by alerting the detectives with behavioral changes.  See Florida v. Jardines, 569 U.S.

at 3.  As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he

had been trained to detect," and after tracking back and forth, sat at the base of the front door,

"which is the trained behavior upon discovering the odor's strongest point."  Florida v. Jardines,

569 U.S. at 3.  The dog's handler then immediately leaves the porch, and tells the other agents and

officers at the scene that there is a positive alert for drugs, at which time the officers apply for and

receive a search warrant for the residence, the execution of which reveals marijuana plants.  See

Florida v. Jardines, 569 U.S. at 3.  Jardines is arrested for trafficking in marijuana and moves to

suppress the evidence based on an illegal search.  See Florida v. Jardines, 569 U.S. at 3.

Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search,

reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

Florida v. Jardines, 569 U.S. at 5.  Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects."  Florida v. Jardines, 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  Florida v. Jardines, 569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage.  Florida v. Jardines, 569 U.S. at 7.  Justice Scalia then "turn[s] to the question of whether it was accomplished through an unlicensed physical intrusion," Florida v. Jardines, 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

Florida v. Jardines, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit

license which "typically permits the visitor to approach the home by the front path, knock

promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he

concludes that "introducing a trained police dog to explore the area around the home in hopes of

discovering incriminating evidence is something else. There is no customary invitation to do that."

Florida v. Jardines, 569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

> An invitation to engage in canine forensic investigation assuredly does not
> inhere in the very act of hanging a knocker. To find a visitor knocking on the door
> is routine (even if sometimes unwelcome); to spot that same visitor exploring the
> front path with a metal detector, or marching his bloodhound into the garden before
> saying hello and asking permission, would inspire most of us to -- well, call the
> police.  The scope of a license -- express or implied -- is limited not only to a
> particular area but also to a specific purpose. Consent at a traffic stop to an officer's
> checking out an anonymous tip that there is a body in the trunk does not permit the
> officer to rummage through the trunk for narcotics. Here, the background social
> norms that invite a visitor to the front door do not invite him there to conduct a
> search.

Florida v. Jardines, 569 U.S. at 3.

Justice Scalia further notes that, in United States v. Jones, the Supreme Court concludes

that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional

property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the

test under Katz v. United States] when the government gains evidence by physically intruding on

constitutionally protected areas."  Florida v. Jardines, 569 U.S. at 11 (quoting United States v.

Jones, 565 U.S. at 409).  Because the Supreme Court concludes that the conduct is a Fourth

Amendment search under the trespass-based analysis, therefore, it holds that it is unnecessary to

consider whether the conduct amounts to a search under the Katz v. United States reasonable-

expectation-of-privacy analysis:

Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Florida v. Jardines, 569 U.S. at 11.

### 3.    **Fourth Amendment Standing.**

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing." United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121). The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now has expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones [v. United States] also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39. The Supreme Court emphasizes:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long

> history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognizes that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

Minnesota v. Carter, 525 U.S. at 87-88.  The Supreme Court notes that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same, and that Katz v. United States' reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as opposed to a standing test.  See Rakas v. Illinois, 439 U.S. at 139.

### 4.    Whether a Fourth Amendment Search Occurs.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 565 U.S. at 406.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 565 U.S. at 409 (emphasis in original)(first citing Alderman v. United States, 394 U.S. 165, 176 (1969); and then citing Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).

a. **Trespass-Based Analysis**.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 569 U.S. at 1 (quoting United States v. Jones, 565 U.S. at 406 n.3).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 565 U.S. at 408 n.5 (Scalia, J.)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information."  United States v. Jones, 565 U.S. at 408 n.5.  The Supreme Court also notes that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggests that the trespass-based analysis applies only when the trespass occurs in one of the four places or things that the Fourth Amendment lists:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . . But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 569 U.S. at 6.

### b.    Katz v. United States' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court notes that, in light of the Supreme Court's decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constitutes a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, 943 F. Supp. 2d at 1242 (citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)). Justice Scalia consistently has criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz, see [Katz v. United States, 389 U.S.] at 360) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" [Katz v. United States, 389 U.S. at 361], bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has occurred (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Ibid. Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the Constitution would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original).[4]  In both United States v. Jones and Florida v. Jardines, however, Justice Scalia, writing for the majority, never states that the Supreme Court is substituting the trespass-based analysis for Katz v. United

---

[4]The Honorable Clarence Thomas, Associate Justice, is the only other Justice to join Justice Scalia's Minnesota v. Carter concurrence.

States' reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserts that the

Katz v. United States reasonable-expectation-of-privacy analysis adds to the trespass-based

analysis.  See Florida v. Jardines, 569 U.S. at 11 ("The Katz reasonable-expectations test 'has been

added to, not substituted for,' the traditional property-based understanding of the Fourth

Amendment." (emphasis in original))(quoting United States v. Jones, 565 U.S. at 408).  The Court

concludes in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer,

Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States

reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach

alongside of the trespass-based approach."  United States v. Alabi, 943 F Supp. 2d 1201, 1243

(D.N.M. 2013)(Browning, J.).

In 2013, Justice Scalia dissents from the Supreme Court's decision in Maryland v. King,

569 U.S. 435 (2013), in which the Supreme Court holds that "DNA identification of arrestees is a

reasonable search that can be considered part of a routine booking procedure."  Maryland v. King

569 U.S. at 465.  Justice Scalia criticizes the majority's opinion for analogizing DNA testing to

taking an arrestee's photograph by citing to Katz v. United States and noting that "we have never

held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"

Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting).  Justice Scalia also notes that a person's

"privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty
> enough that the search may require a warrant, notwithstanding the diminished
> expectations of privacy of the arrestee."  But why are the "privacy-related
> concerns" not also "weighty" when an intrusion into the body is at stake? (The
> Fourth Amendment lists "persons" first among the entities protected against
> unreasonable searches and seizures.).

Maryland v. King, 569 U.S. at 469 (Scalia, J., dissenting)(emphasis in original).  Justice Scalia

also suggests that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more
> crimes; then again, so would the taking of DNA samples from anyone who flies on
> an airplane (surely the Transportation Security Administration needs to know the
> "identity" of the flying public), applies for a driver's license, or attends a public
> school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt
> that the proud men who wrote the charter of our liberties would have been so eager
> to open their mouths for royal inspection.

Maryland v. King, 569 U.S. at 469 (Scalia, J., dissenting).  The Court therefore concludes that

Justice Scalia and the Supreme Court still may rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL

712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

### c.    **Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights,

may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v.

United States, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant

proves that a search implicates personal Fourth Amendment interests."  United States v. Jones, 44

F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the

Fourth Amendment' is implicated by governmental investigative activities unless there is an

intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his

property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440

(1976)(quoting <u>Hoffa v. United States</u>, 385 U.S. 293, 301-02 (1966)).[5]  The Tenth Circuit notes

that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the

premises searched."  <u>United States v. Jones</u>, 44 F.3d at 871 (citing <u>United States v. Roper</u>, 918

F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search

implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-

---

[5]The Court previously has stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"  <u>Kerns v. Bd. of Comm'rs of Bernalillo Cnty.</u>, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting <u>Katz v. United States</u>, 389 U.S. at 351). In support for this proposition, the Court relies on the majority's decision in <u>Katz v. United States</u>, where the Supreme Court states that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.  The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not.  But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.  For the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  <u>See Lewis v. United States</u>, 385 U.S. 206, 210 [1966]; <u>United States v. Lee</u>, 274 U.S. 559, 563 . . . (1927).  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  <u>See Rios v. United States</u>, 364 U.S. 253 . . . [1960]; <u>Ex parte Jackson</u>, 96 U.S. 727, 733 . . . [1877].

<u>Katz v. United States</u>, 389 U.S. at 351-52.  The Supreme Court has changed course.  In <u>Florida v. Jardines</u>, the particular place at which the search occurs weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . protections 'when the Government <u>does</u> engage in a physical intrusion of a constitutionally protected area.'"  <u>Florida v. Jardines</u>, 569 U.S. at 5 (ellipses added)(emphasis in original)(quoting <u>United States v. Knotts</u>, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  <u>See United States v. Jones</u>, 565 U.S. at 407 ("<u>Katz</u> did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . <u>Katz</u> did not narrow the Fourth Amendment's scope.'" (ellipses added)(citing <u>United States v. Knotts</u>, 460 U.S. at 407-08).

based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has recognized, therefore, that, rather than determining whether law enforcement conduct is a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court thus articulates the Katz v. United States rule -- which Professor Wayne R. LaFave notes is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula")) -- as follows: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize

that expectation as reasonable.'" <u>Kyllo v. United States</u>, 533 U.S. at 33 (emphasis in original)(quoting <u>California v. Ciraolo</u>, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>United States v. Jones</u>, 565 U.S. at 408. <u>See</u> <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . ."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." <u>Rakas v. Illinois</u>, 439 U.S. at 143 & n.12. While ownership or lawful possession is not determinative under the <u>Katz v. United States</u> reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. <u>Kentucky v. King</u>, 563 U.S. 452, 459 (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)). <u>See</u> <u>Samson v. California</u>, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)). "Although the Fourth Amendment ordinarily

requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing Terry v. Ohio, 392 U.S. 1 (1968)). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).   "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)). The Supreme Court holds that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner has a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation is to consent to search of his apartment without notice or probable cause, and because he is clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). See also Dorato v. Smith, 108 F. Supp. 3d 1064, 1118 (D.N.M.

2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure). "A police officer may seize someone either by physical force or a show of authority." United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

1.      __Consensual Encounters__.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

2.      __Investigative Stops__.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (Terry v. Ohio, 392 U.S. 1, 16, 27 (1968)).  The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."  United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished); United States v. King, 990 F.2d at 1557.

### a.    Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a Constitutional investigative detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d at 1118.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  See Illinois v.

Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit holds that an officer has reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer responds to a call from a citizen who gives his telephone number, and gives a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurs in Albuquerque's highest-crime area; and (iii) the suspect displays nervous behavior. See 364 F.3d at 1194. The Tenth Circuit notes that the officer's experience and training allows him to make inferences, based on a combination of the surrounding circumstances, that criminal activity is afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details."). While many of the factors that the Tenth Circuit considers would not, without more, have given rise to reasonable suspicion, the combination of circumstances is sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), a police officer observes a young girl walking down the street at night. See 355 F. App'x at 227-28. A truck pulls alongside the girl, the driver of the truck and the girl speak briefly, then the truck drives ahead, and the girl continues on her walk. See 355 F. App'x at 228. Rather than leave, however, the truck drives ahead and parks with its lights off at a dark spot on the road where the girl would have to walk. See 355 F. App'x at 228. The officer speaks to the girl, who seems unconcerned

and tells him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turns on his emergency lights and pulls behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovers that Ceballos' breath smells of alcohol, that he does not have a driver's license, and that he has a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit concludes that the facts available to the officer would lead a reasonable officer to conclude that reasonable suspicion exists and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit explains, in an opinion that the Honorable Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the Honorable Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, and the Honorable Robert H. McWilliams, the late United States Circuit Judge for the Tenth Circuit, join:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit does not require the officer to identify the particular crime

of which the officer has reasonable suspicion or even to acknowledge having reasonable suspicion.

See 355 F. App'x at 229.  The Tenth Circuit is content to find that a reasonable officer would have

reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355

F. App'x at 229.   The Tenth Circuit demands only that an officer have facts from which a

reasonable officer could form a reasonable suspicion that criminal conduct is occurring or is about

to occur.  See 355 F. App'x at 229.

        In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth

Circuit finds reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the
> officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner
> consistent with an attempt to find a route to flee; and, (5) approach to [a private]
> home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the Honorable

Martha A. Vázquez, United States District Court Judge for the District of New Mexico, concludes

that, because the defendant's conduct in standing outside a private residence and looking in was

"'consistent with the most benign of conduct, including a visit to a friend's house or calling upon

a neighbor for assistance,'" the officer does not have reasonable suspicion at the time of the stop

and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting United

States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10,

2011)(Vázquez, J.)).  The Tenth Circuit disagrees, however, stating: "The problem is that conduct

giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and

often is -- consistent with innocent behavior."  United States v. Aragones, 483 F. App'x at 418.

The Tenth Circuit notes that, moreover, the defendant's conduct is not necessarily innocent,

because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)). The Tenth Circuit, thus, reverses Judge Vázquez' decision, disagreeing with her conclusion that the officer lacks reasonable suspicion of unlawful activity, and concludes that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

<strong>b.    Frisks.</strong>

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

<strong>c.    Traffic Stops.</strong>

"'A traffic stop is a seizure within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th

Cir. 1998)).  "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).   "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."  United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131)(first citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998);  and then citing United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope

of the [further] detention must be carefully tailored to its underlying justification.'"  United States

v. Wilson, 96 F. App'x at 644 (alterations in original)(quoting United States v. Wood, 106 F.3d

942, 945 (10th Cir. 1997)).[6]  "A traffic stop is justified at its inception if an officer

---

[6]A tension exists between some of Tenth Circuit cases and earlier Supreme Court cases -- which are fairly lenient toward law enforcement personnel with regards to expanding a traffic violation's scope -- and Justice Ginsburg's statement in Rodriguez v. United States that a traffic stop "may last no longer than is necessary to effectuate th[e stop's] purpose."  135 S. Ct. at 1614. Justice Ginsburg's statement is rooted in prior cases such as Florida v. Royer, 460 U.S. at 500, and Illinois v. Cabelles, 543 U.S. at 407.  Nevertheless, Justice Ginsburg may be signaling a new and more restrictive direction in traffic stops.  Although the Supreme Court and the Tenth Circuit hold that: (i) a police officer can detain a motorist only as long as necessary to complete the tasks that justified the stop; and (ii) as a general principle, a Terry stop cannot exceed the stop's reason's scope, see Rodriguez v. United States, 135 S. Ct. at 1614, the Supreme Court and the Tenth Circuit over the years incrementally have added permissible tasks within the stop context.  The resulting tension arises from the fact that, on the one hand, officers must take no more time than necessary to perform tasks related to the stop, but that, on the other hand, the tasks related to the stop are innumerable.  In effect, the rule of "no longer than is necessary" has transformed from brutalist to rococo: a strong, unadorned statement embellished and filigreed to the point that it almost has become unrecognizable.  See Rodriguez v. United States, 135 S. Ct. at 1614.

For instance, if a patrol officer stops a motorist for speeding, it is unclear why the patrol officer can ask to see the motorist's registration or insurance card.  If the patrol officer only has probable cause to investigate the speeding infraction, the patrol officer must, when he or she examines registration and insurance, be investigating whether the motorist violated any other traffic code provisions, such as those that require a motorist to have a valid driver's license and automobile insurance.  The same can be said for VIN inspections.  If a patrol officer pulls a

motorist over for speeding, the VIN -- a static number -- provides no information related to the vehicle's speed. The only reason a patrol officer would examine a VIN is to detect whether the vehicle is stolen. Whether a patrol officer checks a motorist's license and registration, or rubbernecks inside the driver's door to check the doorjamb VIN sticker, these actions take time and are unrelated to the investigation whether the motorist violated speeding maximum vehicular speed laws. Nevertheless, <u>Rodriguez v. United States</u> does not find that such actions extend the traffic stop longer than is necessary. <u>See Rodriguez v. United States</u>, 135 S. Ct. at 1613.

The Tenth Circuit has wrestled with the tension internal to <u>Rodriguez v. United States</u> multiple times in an attempt to pin down what precisely constitutes an unconstitutional extension of a traffic stop. <u>See, e.g.</u>, <u>United States v. Williams</u>, 271 F.3d 1262 (10th Cir. 2001); <u>United States v. Holt</u>, 229 F.3d 931 (10th Cir. 2000). In an opinion that later was vacated on rehearing en banc, the Tenth Circuit, in a decision that Judge Briscoe wrote and Judge McKay joins -- but from which Judge Ebel dissents -- questions whether inquiries about a driver's travel plans relate to a stop's purpose. <u>See United States v. Holt</u>, 229 F.3d at 936. The Tenth Circuit states in its decision that "none of the [Tenth Circuit's previous] decisions explore or explain why it is constitutionally permissible for an officer to ask [a] detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop." <u>United States v. Holt</u>, 229 F.3d at 936 (first citing <u>United States v. Kopp</u>, 45 F.3d 1450, 1454 (10th Cir. 1995)(acknowledging that officer asked detainee questions about his travel plans); then citing <u>United States v. McSwain</u>, 29 F.3d 558, 561 (10th Cir. 1994)(stating that "an officer conducting a routine traffic stop may inquire about 'identity and travel plans'"); and then citing <u>United States v. Rivera</u>, 867 F.2d 1261, 1263 (10th Cir. 1989)(holding that it was permissible for an officer to "ask questions relating to . . . identity and travel plans")). The Tenth Circuit nevertheless distinguishes its former decisions allowing travel-related questions and the case at issue, where the officer questions whether the motorist's vehicle contains loaded weapons, and the Tenth Circuit appears to have segregated travel-related questions in a different category. <u>See</u> 229 F.3d at 936. After a rehearing en banc, the Tenth Circuit vacated the decision. <u>See United States v. Holt</u>, 264 F.3d 1215, 1217-18 (10th Cir. 2001)(en banc), <u>vacating</u> 229 F.3d 931 ("<u>Holt II</u>").

In later describing <u>Holt II</u>, the Tenth Circuit reaffirms its prior notion that travel-related questions are within a traffic stop's scope. It therewith contradicts <u>Holt I</u>'s assertion that the Tenth Circuit had not directly addressed the issue, stating:

> When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. <u>See West</u>, 219 F.3d at 1176 (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop'")(quoting <u>United States v. Hernandez</u>, 93 F.3d 1493, 1499 (10th Cir. 1996)); <u>see also</u> <u>United States v. Santana-Garcia</u>, 264 F.3d 1188, 1192-93 (10th Cir. 2001)(quoting <u>West</u>, 219 F.3d at 1176); <u>United States v. Rivera</u>, 867 F.2d 1261, 1263 (10th Cir. 1989); <u>United States v. Hill</u>, 195 F.3d 258, 268 (6th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1176 . . . (2000); <u>United States v. $404,905.00 in U.S. Currency</u>, 182 F.3d 643, 647 (8th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1161 . . . (2000). Though such questions <u>do typically fall within the scope of a traffic stop</u>, citizens' legitimate privacy interests are protected in that they are not

---

legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. See United States v. $404,905.00, 182 F.3d at 647 n.2 (citing Terry [v. United States], 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." Terry [v. United States], 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring).

United States v. Williams, 271 F.3d at 1267 (emphasis added). After clarifying that travel-related questions are within a traffic stop's scope, the Tenth Circuit concludes that "the officer's questioning regarding [the motorist's] travel plans was within the scope of the traffic stop." 271 F.3d at 1267.

The Court is of the opinion that many of the tasks that the Supreme Court and the Tenth Circuit allow are inconsistent with the Constitution of the United States and that the federal courts should be cautious about allowing too many unnecessary tasks. The Court suggests that officers should take no longer than necessary to investigate the particular reason for a given traffic stop unless: (i) the patrol officer has reasonable suspicion or probable cause to investigate other crimes; or (ii) the motorist gives consent. The Court would be hard-pressed to conclude that a patrol officer routinely should be permitted to check a motorist's registration and insurance, inspect a stopped vehicle's VIN, or barrage a motorist with travel-related questions after writing a ticket or handing back papers, without reasonable suspicion or consent.

At the oral argument for Rodriguez v. United States, the Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, also questioned why checking a driver's license, asking travel-related questions, and determining whether a car is stolen "are embraced within the mission [of a traffic stop for a broken taillight] when the only basis for the stop is you have a broken taillight." Transcript of Oral Argument at 9, Rodriguez v. United States, 135 S. Ct. 1609 (2015)(No. 13-9972)("Rodriguez Tr."); id. at 10 ("It's a broken taillight. That's the only thing that comes within the traffic stop. All the rest is added on."). The Honorable Samuel Alito, Associate Justice of the Supreme Court, similarly asked why "adding any time to the stop in order to do a records check is part of the mission but the dog sniff is not." Rodriguez Tr. at 21. Justice Scalia concluded that courts are "willing to expand the mission to everything up to but not beyond the dog sniff." Rodriguez Tr. at 10.

The Court shares Justice Scalia's and Justice Alito's skepticism toward the current state of the law on this issue, and is convinced that the police should accomplish the narrow task set related to the stop and let the driver go, rather than use a traffic stop to investigate for more crimes, unless there is reasonable suspicion or consent. The Court is, however, a district court, and Supreme Court and Tenth Circuit precedent bind it. Even if the Court thinks and hopes that Justice Ginsburg's statement that a stop "may last no longer than is necessary to effectuate th[e stop's] purpose," 135 S. Ct. at 1614, signals the direction that the Supreme Court will go, the Court as a district court cannot ignore Supreme Court and Tenth Circuit cases.

has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d at 1134.

**3.    Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)); a police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, see United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[7] United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.). See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'")(quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013)(unpublished). "Probable cause to arrest exists only when the 'facts

---

[7]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'" United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court makes the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

a.    **When a Detention Becomes an Arrest**.

The Tenth Circuit holds that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court determines whether the police transform the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court concludes that such measures are appropriate and do not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1463).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe

that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462). See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint, and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the traffic stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street."). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action

designed to provide for the safety of the agents."). United States v. Perea is one of those unique cases, because the police have reasonable cause to believe that the person they detain is the suspect they seek to arrest -- a man wanted for murder who, they believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The Tenth Circuit affirms the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety. United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)). The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### b.    Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In <u>Romero v. Fay</u>, the Tenth Circuit confronts the issue of when an officer must conduct further investigation before arresting an individual. In that case, law enforcement officers interview two individuals -- Stella Gutierrez and Manuel Duran -- who implicate the plaintiff in a murder. <u>See</u> 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrests the plaintiff for murder. <u>See</u> 45 F.3d at 1474. After he is taken into custody, the plaintiff tells the officer that he is innocent and that he has an alibi. <u>See</u> 45 F.3d at 1474. The plaintiff states that three individuals would establish that he was asleep at home when the murder occurred. <u>See</u> 45 F.3d at 1474. The officer refuses the plaintiff's offer of names of alibi witnesses and says that the witnesses "were of little significance because they would lie to protect" the plaintiff. 45 F.3d at 1474. The officer never interviews the alibi witnesses. <u>See</u> 45 F.3d at 1474. The plaintiff is incarcerated for three months before the government dismisses the case and he is released. <u>See</u> 45 F.3d at 1474.

The plaintiff brings a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights. <u>See</u> <u>Romero v. Fay</u>, 45 F.3d at 1474. The plaintiff argues that, regardless of whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. <u>See</u> 45 F.3d at 1476. The Tenth Circuit disagrees, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit join. <u>See</u> 45 F.3d at 1476. The Tenth Circuit states that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate

basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power

of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit determines:

> Once [the defendant] concluded based on the facts and information known
> to him that probable cause existed to arrest Plaintiff for the murder of David
> Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not
> negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi
> witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrest the plaintiff for shoplifting after: (i) receiving

reports from store security guards that they witnessed her shoplifting on store surveillance; and

(ii) watching a video of the surveillance footage on which the security officers relied in reaching

their conclusion, which supported the plaintiff's story that she had not stolen anything. See 147

F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable

Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the

Honorable James Kenneth Logan, the late United States Circuit Judge for the Tenth Circuit join,

conclude that qualified immunity does not apply. See 147 F.3d at 1257-59. The Tenth Circuit

asserts that the security guards' allegations are based solely on the plaintiff's conduct, "which was

memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit states that the

police officers "viewed the very same conduct on the videotape, which this court has concluded

failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit holds that, consequently,

"it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at

1257. The Tenth Circuit adds:

> police officers may not ignore easily accessible evidence and thereby delegate their
> duty to investigate and make an independent probable cause determination based
> on that investigation. . . . Here, [the defendants] did conduct some investigation by
> viewing the videotape and questioning [the plaintiff]. They argue, however, that
> they should be allowed to rely on the statement of the guards for probable cause to

arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers respond to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her. See 478 F.3d at 1113. Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend. See 478 F.3d at 1113. The Tenth Circuit, in an en banc opinion that the Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit, authored, explains that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant]. See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Based on the facts above, [the defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted). The Tenth Circuit further holds that,

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . [at] 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses

were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming. Defendants, however, . . . conducted no investigation. Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted). The Tenth Circuit concludes, therefore, that qualified immunity does not apply. See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrests the plaintiff, Mitchell Garcia, for sexual penetration of a minor. See 2011 WL 7444745, at *8. The plaintiff is ultimately exonerated, and subsequently files a § 1983 claim against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights. See 2011 WL 7444745, at *12. The Court concludes that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz. See 2011 WL 7444745, at *43-46. Garcia argues that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15. Garcia contends that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights. See 2011 WL 7444745, at *15. Garcia argues that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie. See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explains:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene,

- 48 -

Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . .

Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . . The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

> Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest.  We disagree.

45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas might have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the

functional equivalent of formal arrest.'"  United States v. Hudson, 210 F.3d at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

    **1.**    **Custodial Interrogation.**

    A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial-interrogation context.  See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991).  See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order to implicate Miranda and Edwards,[8] there must be a custodial interrogation.").  "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444).  There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'"  J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).  "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'"  J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112).  A suspect's Miranda rights, such as a suspect's right to

---

       [8]Edwards v. Arizona, 451 U.S. 477 (1981), holds that, once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484-85.

counsel, may trigger before a law-enforcement officer gives a Miranda warning.  See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

The Tenth Circuit -- recognizing that a determination whether the totality of circumstances make an interrogation "custodial" is fact-intensive -- instructs district courts to consider several non-exhaustive factors in determining whether a custodial interrogation took place.  See United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008).  Those factors include: (i) whether the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the interview's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See United States v. Jones, 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Several factors indicate that the police dominate the encounter: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) multiple officers' threatening presence; (iv) an officer displaying weapons; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523 F.3d at 1240.  The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others.  See United States v. Jones, 523 F.3d at 1240.

What amounts to custody, however, is only half of the inquiry.  See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'"  (alterations in United States v. Cash but not in Fox v. Ward)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).  A suspect

in custody may not invoke his <u>Miranda</u> rights if he is not also interrogated.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require merely "express questioning of a defendant while in custody."  <u>Rhode Island v. Innis</u>, 446 U.S. at 298-99.  The Supreme Court explains that <u>Miranda</u> is concerned with more than just questioning, but also the "'interrogation environment,'" which implicates practices that "did not involve express questioning." <u>Rhode Island v. Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 458).  "For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator.  This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation." <u>Rhode Island v. Innis</u>, 446 U.S. at 299 (citing <u>Miranda</u>, 384 U.S. at 453).

> A variation on this theme discussed in <u>Miranda</u> was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

<u>Rhode Island v. Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 453).  Accordingly,

> the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

<u>Rhode Island v. Innis</u>, 446 U.S. at 301 (quoting <u>Miranda</u>, 384 U.S at 439).  <u>See</u> <u>United States v. Cash</u>, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response."  (emphasis added in <u>United States v. Cash</u> but not in <u>Fox v. Ward</u>)(quoting <u>Fox v. Ward</u>, 200 F.3d at 1298)). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Rhode Island v. Innis</u>, 446 U.S. at 301.  <u>See</u> <u>United States v. Yepa</u>, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards does not constitute interrogation). The Tenth Circuit concludes, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning.").

The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect is handcuffed and placed in the back of a squad car after a scuffle with the police, but these actions do not amount to an interrogation -- even though questioning is imminent. 733 F.3d at 1278-79. Rather, the Tenth Circuit focuses its inquiry on specific exchanges between the suspect and the officers to determine whether the officer's questions are "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis instructs. United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301). See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions. In United States v. Romero, 743 F. Supp. 2d 1281 (D.N.M. 2010)(Browning, J.), aff'd on other grounds, 749 F.3d 900 (10th Cir. 2014), the Court applies Rhode Island v. Innis and concludes that a suspect is subject to

interrogation, but is not in custody, so Miranda does not apply.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court determines that a suspect is interrogated, because officers ask the suspect about his whereabouts on a Friday night, and the officer know that the suspect is the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332. The Court concludes, however, that the suspect is not in custody, because there is "nothing excessively coercive . . . about the circumstances of the questioning."  743 F. Supp. 2d at 1334. The suspect sat in a police vehicle while questioned, but: (i) he sits in the front seat; (ii) the car's back door is open, suggesting informality; (iii) both windows are rolled down, also suggesting informality and indicating that the suspect is not in a non-public questioning room; (iv) there is no prolonged accusatory questioning; (v) the suspect is not taken to a police station; (vi) law enforcement officers do not display their weapons; and (vii) the officers never touch the suspect. See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs is in custody, but that no interrogation occurs when the officer does not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that the questioning constitutes an interrogation, but that the interrogation is not custodial, because, even though the police dominate the interrogation by isolating the defendant in the police vehicle with multiple officers and with at least one visible firearm, the defendant is told that he can stop the interview if he wants or not answer a question, and the questioning is not "prolonged" or "accusatory"); id. at 1362-63 (concluding that, in a second interview at an FBI office which the defendant attends "unexpectedly and without an appointment," the defendant is not in custody, because the law enforcement officers (i) tell the defendant he does not have to answer questions if he does not want to answer them, (ii) "engage[]

in little questioning," instead "allow[ing] [the defendant] to speak at length"; and (iii) does not dominate the questioning); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurs where the defendant is advised of his rights, makes the incriminating statements after making his telephone call, admits that he received no pressure to waive his rights, and is not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interview the defendant in surroundings familiar to him, inform him of his rights, engage in no coercive conduct, and give the defendant a choice to speak with them and sign an advice of rights form).

## 2.    **Miranda Waiver.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(quoting United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurs. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit notes that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  In determining whether a waiver of rights is knowing and intelligent, the Tenth Circuit employs a totality-of-the-circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).  A "state of intoxication does not automatically render a statement involuntary."  United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).  "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'"  United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith, but not in Dickerson v. United States)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considers whether a suspect waives knowingly his Miranda rights after he is given the warning and responds to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect is "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court

concludes that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.  See United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waives Miranda rights during an interrogation).

**3.    Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court holds:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expands on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484-85.  See Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."); Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."). The Tenth Circuit holds that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers issue a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to

question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

4.    **Midstream _Miranda_ Warnings.**

The Supreme Court first considers midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad"), a home-burglary case. In Elstad, a witness to the burglary implicates an eighteen-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confront the teenager in his parents' home. See 470 U.S. at 300. Without issuing a Miranda warning, detectives briefly question Elstad in his parents' living room, and Elstad admits that he is involved in the burglary. See 470 U.S. at 301. The detectives then escort Elstad to the sheriff's headquarters and read him his Miranda rights. See 470 U.S. at 301. Elstad waives his rights and gives a full written confession. See 470 U.S. at 301-02.

On appeal, Elstad argues that his "confession was tainted by the earlier failure of the police to provide Miranda warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contends that the confession "must be excluded," Elstad, 470 U.S. at 305. The Supreme Court disagrees with Elstad, concluding that "procedural Miranda violation[s] differ[] in significant respects from" Fourth Amendment violations. Elstad, 470 U.S. at 306 (alterations added). It explains that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily mean that there was a Constitutional violation. See Elstad, 470 U.S. at 306-07. The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer Miranda warnings," on the other hand, "creates a presumption of compulsion," but, nevertheless, Miranda bars "unwarned statements that are otherwise voluntary." Elstad, 470 U.S. at 306-07. Thus, the "Miranda exclusionary rule" is prophylactic and "sweeps more broadly than the Fifth Amendment

itself." Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[9]

---

[9]There is tension in this reasoning and with the Supreme Court's later determination in Dickerson v. United States, 530 U.S. 428 (2000)("Dickerson"), that Miranda is a Constitutional rule. See 530 U.S. at 437-38, 441. In Dickerson, although conceding that "we have repeatedly referred to the *Miranda* warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at 437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S. 433, 444 (1974)), the Supreme Court concludes that "*Miranda* is a constitutional decision," because (i) it had consistently applied Miranda to State court decisions; and (ii) Miranda has invited legislative action "to protect the constitutional right against coerced self-incrimination," Dickerson, 530 U.S. at 438-40. If Miranda is a Constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself." Elstad, 470 U.S. at 306. It is possible that the Supreme Court meant that Miranda implicates additional Constitutional amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the Supreme Court meant that Miranda's exclusionary rule arises from judicial rulemaking and not from some other Amendment beyond the Fifth. See Elstad, 470 U.S. at 305; id. at 307 ("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm."). The Supreme Court, in expressly recognizing this tension, notes that Elstad "does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." Dickerson, 530 U.S. at 441. But see Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with *Miranda*'s rules does not establish a constitutional violation was central to the *holdings* of [*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added).
    Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rests, in large part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a Constitutional rule reopens the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning. See United States v. Patane, 542 U.S. 630, 636 (2004)(plurality op.)("Patane")("Based on its understanding of *Dickerson*, the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does not apply to *Miranda* violations."). See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").
    The Supreme Court attempts to resolve this tension in Patane, but a divided court does not produce a controlling opinion. See Patane, 542 U.S. at 635-36. The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determine that Miranda is a prophylactic rule and that admitting "fruits" evidence from a voluntary statement does not implicate the Fifth Amendment's self-incrimination clause. Patane, 542 U.S. at 636. The plurality reasons that, even taking Dickerson's holding to heart that Miranda

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the

exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution still may

use for impeachment purposes a confession obtained in violation of Miranda.  See Elstad, 470 U.S.

at 307.  Moreover, the Supreme Court reasons that categorically barring a confession after a

midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda

rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433

---

is a Constitutional rule, there must be a close fit between the Constitutional violation and the
remedy.  See Patane, 542 U.S. at 643.  The plurality concludes that admitting nontestimonial fruits
of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between
the Miranda violation and the exclusionary remedy.  See Patane, 542 U.S. at 643 ("The admission
of such fruit presents no risk that a defendant's coerced statements (however defined) will be used
against him at a criminal trial.").  In so concluding, the three Justices in the plurality reaffirm that
Elstad's reasoning is sound.  See  Patane, 542 U.S. at 639-40.  The Honorable Sandra Day
O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court,
concur in the judgment and agree that Elstad is still good law after Dickerson.  See Patane, 542
U.S. at 645 (Kennedy, J., concurring).   The two Justices do not adopt, however, expressly the
Constitutional "fit" analysis that the plurality deploys.  Patane, 542 U.S. at 645.  They concluded
that admitting nontestimonal fruits from a voluntary statement "does not run the risk of admitting
into trial an accused's coerced incriminating statements against himself."  Patane, 542 U.S. at 645
(Kennedy, J., concurring).  Instead of concluding that such a remedy does not fit the Constitutional
violation, however, they conclude that excluding such evidence does not serve the police
"deterrence rationale" infusing Miranda.  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The
concurrence does not comment on Elstad's rationale that Miranda does not justify excluding
"fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a Constitutional rule.

Elstad's Constitutional reasoning, thus, may no longer be good law, but its trustworthiness
and deterrence rationales may be.  See Elstad, 470 U.S. at 308.  Moreover, despite Dickerson's
suggestion that "fruits" evidence may need to be excluded as Miranda is a Constitutional rule, five
Justices eschew that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court
concludes that a procedural Miranda violation does not require the Court to exclude nontestimonial
evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun
v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court joins the Justices who have noted that Miranda is not properly
rooted or found in the Constitution, but instead is the product of the Supreme Court's power,
wherever that power rests under the Constitution, to provide prophylactic rules.  See Maryland v.
Shatzer, 559 U.S. at 106.  It may not be a bad rule in that it has -- with its bright-line application -
- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its
Constitutional and jurisprudential underpinnings are shaky if not non-existent.

("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)). If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt. See Elstad, 470 U.S. at 308. The deterrence rationale likewise loses force when the officers act in good faith compliance with Miranda. See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)). Accordingly, the Supreme Court holds that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309. See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concludes that Elstad's pre- and post-Miranda confessions are voluntary and therefore admissible. See Elstad, 470 U.S. at 314-15. It notes that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad, 470 U.S. at 310. Where, however, the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible. Elstad, 470 U.S. at 310. Rather, the Miranda warning

"serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasons that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda is elicited under coercive conditions, the Supreme Court deems it admissible. See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing'" with his first statement, Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), in no way creates a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314. Dissenting Justices note that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions." Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considers midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issues only a plurality opinion. 542 U.S. at 603-05.[10] In Seibert, a young boy with cerebral palsy dies in his sleep, and his mother fears charges of neglect, because the boy's body was covered in bedsores. See 542 U.S. at 604. The mother, along with two of her remaining sons and family friends, conspire to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it. See 542 U.S. at 604. To avoid

---

[10]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announces the Court's judgment and delivers an opinion that the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices, join. See Seibert, 542 U.S. at 603. Justice Breyer files a concurrence, and Justice Kennedy concurs in the judgment. See Seibert, 542 U.S. at 617-18. Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissent. See Seibert, 542 U.S. at 622.

the appearance that they had left the boy unattended, they arrange for Donald Rector, a mentally ill teenager living with the family, to remain in the mobile home while they set fire to it. See 542 U.S. at 604. The conspirators executed their plan, and Rector died in the fire. See 542 U.S. at 604.

Missouri officers subsequently arrest the mother. See 542 U.S. at 604. Officer Kevin Clinton refrains from issuing her a Miranda warning on instructions from police headquarters. See Seibert, 542 U.S. at 604. Another officer, Richard Hanrahan, questions her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admits that Rector "was meant to die in the fire." Seibert, 542 U.S. at 605. After a twenty-minute break, Hanrahan issues a Miranda warning, obtains a signed waiver of rights, and secures the same confession with a similar line of questioning. See Seibert, 542 U.S. at 605. According to Hanrahan, he consciously decides to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "Question first, then give the warnings, and then repeat the question until he got the answer previously given." Seibert, 542 U.S. at 600.

On appeal, the Supreme Court notes that Hanrahan's tactic of question first, issue Miranda warnings later, is not confined to Missouri. See Seibert, 542 U.S. at 609. The Supreme Court further notes that such a tactic is at odds with Miranda's purpose; Miranda seeks to ensure that individuals make a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384 U.S. at 464-65), with full knowledge of their Constitutional rights before speaking with officers, whereas "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed," Seibert, 542 U.S. at 611. The plurality continues:

[I]t is likely that if the interrogators employ the technique of withholding warnings

until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content . . . .  Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again . . . .  What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.  Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)).  But see Seibert,

542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of

the bag" theory that the Supreme Court in Elstad rejects).  Accordingly, the plurality holds that

"[t]he threshold issue when interrogators question first and warn later is thus whether it would be

reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda*

requires."  Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concludes that the following factors bear on whether a midstream Miranda

warning can be effective:

[(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality adds another factor: whether officers advise

the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S.

at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality notes

that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as

it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent

that show the question-first tactic at work." 542 U.S. at 616 n.6. The plurality concludes that the midstream Miranda warning is ineffective, because the pre- and post-Miranda questioning occur in the same location, the post-Miranda phase occur only twenty minutes after the pre-Miranda phase, the officers treat the two phases of questioning as continuous, and the pre-Miranda phase leaves "little, if anything, of incriminating potential left unsaid." Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasts Seibert with Elstad, and concludes that the officer's failure to warn in Elstad is a good-faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'" Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313). "In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience." Seibert, 542 U.S. at 615. Moreover, the police station interrogation goes "well beyond the scope of the laconic prior admission" in the suspect's living room. 542 U.S. at 614. Justice Breyer concurs, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." 542 U.S. at 617 (Breyer, J., concurring)(source of quoted material not cited). He joins "the plurality's opinion in full," however, because he concludes that "the plurality's approach in practice will function as a 'fruits' test." 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurs in the judgment but writes separately and adopts a different test. See Seibert, 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolates a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of Miranda are not likely to be implicated and when other objectives of the criminal justice system

are best served by its introduction." <u>Seibert</u>, 542 U.S. at 618-19 (Kennedy, J., concurring).  From

that general principle, he concludes that an officer's deliberate intent to withhold a <u>Miranda</u>

warning in an effort to obtain a confession without informing a suspect of his rights "distorts the

meaning of *Miranda* and furthers no legitimate countervailing interest." <u>Seibert</u>, 542 U.S. at 621

(Kennedy, J., concurring).  He disagrees with the plurality, however, because the test that the

plurality articulates "cuts too broadly." <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity.  Cf. *Berkemer v. McCarty*, 468 U.S. 420, 430 . . . (1984).  I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

<u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).  Accordingly, Justice Kennedy articulates the

following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

<u>Seibert</u>, 542 U.S at 622 (Kennedy, J., concurring).[11]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas,

dissent.  <u>See</u> 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting Justices conclude that

<u>Elstad</u>'s voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-

intent test.  <u>See</u> <u>Seibert</u>, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).  According to those

---

[11]The Supreme Court later applies <u>Seibert</u> in a per curiam review of a habeas petition, but it does not resolve which test is controlling as it applies both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  <u>See</u> <u>Bobby v. Dixon</u>, 565 U.S. 23, 30-32 (2011)(per curiam).

Justices, a test focusing on the officer's subjective intent misses the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant. Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience."). The plurality's approach, on the other hand, is defective, because it adopts the "cat out of the bag theory" that the Supreme Court rejected in Elstad. 542 U.S. at 627 (O'Connor, J., dissenting). The dissent notes that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court "refused to endo[w] those psychological effects with constitutional implications" in Elstad. 542 U.S. at 627 (O'Connor, J., concurring)(alteration in original). The dissent explains that to adopt that approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity." 542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original). Accordingly, the dissent would have ordered a remand for the State court to determine whether the statements were made voluntarily. See 542 U.S. at 628 (O'Connor, J. dissenting).

In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit holds that "Justice Kennedy's concurrence is the binding opinion from Seibert." 995 F.3d at 1114. The Tenth Circuit arrives at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'" United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))). The Tenth Circuit explains that Justice Kennedy concurs with the plurality on the

narrowest grounds and is "'a logical subset'" of the plurality opinion.  United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006).  The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's *Seibert* opinion provides the controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream *Miranda* warnings."  United States v. Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

## ANALYSIS

The Court denies the Motion.  First, Jackson initiated Constitutionally the traffic stop, because there is probable cause to believe that at least some of the Chevy's passengers do not have their seatbelts fastened.  Second, Jackson may Constitutionally order passengers and drivers out of a car for the duration of a traffic stop.  Third, the number of passengers in the car as well as the driver's incoherent answers regarding his travel plans provides the basis for reasonable suspicion that justifies prolonging the traffic stop.  Fourth, Martinez is not in custody pursuant to Miranda when Jackson asks him: "Did you just cross into the U.S.?"  The Court, therefore, holds that Martinez' statements to Jackson when Martinez stands in front of Jackson's police car are admissible.

## I.    JACKSON INITIATES CONSTITUTIONALLY THE TRAFFIC STOP.

The Court concludes that Jackson initiated Constitutionally the traffic stop of the Chevy,

because there is probable cause to believe that at least some of the Chevy's passengers do not have their seatbelts fastened.  Although Jackson is a federal law enforcement officer, he is also a commissioned Cibola County Deputy Sheriff; this commission authorizes him to enforce New Mexico law violations.  See Findings of Fact 3, at 3 ("FOF")(describing Jackson's commission); N.M.S.A. § 4-41-5 (describing county sheriffs' powers to appoint deputies); N.M.S.A. § 29-1-11(G)(acknowledging, and not disturbing, sheriffs' powers pursuant to N.M.S.A. § 4-41-5 to employ deputy sheriffs "authorized to enforce New Mexico criminal and traffic law.").  It is well-settled that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. at 809-10.  The officer's true motives, moreover, for executing the traffic stop, i.e., to investigate some other suspected illegal conduct, are irrelevant: The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.  See Whren v. United States, 517 U.S. at 813.  Here, Jackson testifies that, when he pulls parallel the Chevy, he notices that the car is full of people sitting or laying on top of each other, see FOF 7, at 4, and he observes that at least some of the Chevy's occupants are not wearing their seatbelts, see FOF 8, at 4.  N.M.S.A. § 66-7-372(A) requires, with exceptions not at issue here, that a motor vehicle's occupant "shall have a safety belt properly fastened about his body at all times when the vehicle is in motion on any street or highway."  N.M.S.A. § 66-7-372(A).  Therefore, when Jackson observes some of the Chevy's occupants without fastened seatbelts, he has probable cause to conduct a traffic stop pursuant to Whren v. United States.

## II.    JACKSON CONSTITUTIONALLY ORDERS MARTINEZ OUT OF THE CAR.

The Court concludes that Jackson Constitutionally orders Martinez out of the car.  "After a lawful traffic stop, an officer has the authority to order the driver and passengers from the car."

United States v. Morgan, 855 F.3d 1122, 1123 (10th Cir. 2017)(citing Maryland v. Wilson, 519 U.S. 408, 410 (1997)("Wilson")).    Wilson forecloses Martinez' argument that he is "unconstitutionally seized when Officer Jackson directed him to exit the vehicle and stand on the side of the road."  Motion at 4.  In Wilson, the police officer notices that, besides the driver, there are two passengers in the car; ultimately, the police officer orders only one of the two passengers out of the car.  See 519 U.S. at 410-11.  The Supreme Court holds the officer's action is Constitutional.  See Wilson, 519 U.S. at 415 (contrasting the minimal intrusion on the passenger's liberty with traffic stops' inherent dangers to officers).  Similarly, here, Jackson orders only two of the Chevy's many passengers, Martinez and the driver, out of the car.  See FOF 13, at 4; FOF 15, at 5.  Because Wilson permits police officers to order some, but not all, of a car's occupants to exit the car, see 519 U.S. at 410-11, Jackson's ordering Martinez out of the car is Constitutional pursuant to Wilson.

## III.    JACKSON DOES NOT UNREASONABLY PROLONG THE TRAFFIC STOP.

The Court concludes that Jackson does not unreasonably prolong the traffic stop.  As discussed above, Jackson has probable cause to stop the Chevy, because some of its occupants are not wearing seatbelts.  Jackson's probable cause to investigate the traffic violation does not, however, give him the legal authority to conduct any other investigation he wishes: his authority to seize the Chevy's occupants ends when "'tasks tied to the traffic infraction are -- or reasonably should have been -- completed.'"  United States v. Batara-Molina, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)(quoting Rodriguez v. United States, 575 U.S. at 355).  The Tenth Circuit refers to the moment an officer extends a traffic stop beyond its traffic purpose as a "Rodriguez moment," after Rodriguez v. United States; as soon as this moment occurs, an officer may prolong the stop only if the officer has "'reasonable suspicion ordinarily required to detain an individual.'"  United States

v. Batara-Molina, 60 F.4th at 1255 n.1 (citing United States v. Frazier, 30 F.4th 1165, 1173 (10th Cir. 2022)).  Accordingly, the Court must determine when the Rodriguez moment occurs in this case, and, in light of that determination, whether fresh reasonable suspicion exists at that point which justifies extending the stop beyond its traffic purpose.

In this case, the Rodriguez moment occurs when Jackson beckons Martinez over to speak with him and dismisses the driver to stand in the field by the road.  See FOF 24, at 5; FOF 25, at 5.  Up until this point, Jackson's investigation of the seat-belt violation justifies his interactions with the driver; after all, a law enforcement officer must necessarily speak to a car's driver to issue him or her a traffic citation.  Here, Jackson's conversation with the driver, in conjunction with the Chevy's excess number of passengers, provides him with fresh reasonable suspicion to prolong the traffic stop and initiate a human-trafficking investigation by talking with Martinez.  The driver cannot tell Jackson the exact address to which he is traveling in Georgia, see FOF 17, at 5, and he cannot or will not tell Jackson the names of the other passengers in the Chevy, see FOF 19, at 5.  These answers make "any innocent explanations" for the overly full Chevy less likely.  United States v. Rice, 483 F.3d at 1085.  The driver's inability to provide an address, is consistent with the notion that this is a business trip featuring specific protocols designed to insulate the enterprise from police detection.  Moreover, the driver's refusal to tell Jackson the other passengers' names gives rise to the plausible inference that he does not, in fact, know their names, because they are paying him or his employer to move them across the country, and they are not his friends.  The driver's odd answers, taken together with the number of passengers in the Chevy, provide Jackson with the "'minimum level of objective justification'" that permits him to prolong the stop beyond its traffic purpose and question Martinez.  United States v. Rice, 483 F.3d 1079, 1083 (1oth Cir. 2007)(quoting United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006)).

Jackson's conversation with Martinez does not dispel the fresh reasonable suspicion. Martinez obfuscates, delays, and avoids telling Jackson his real name.  See FOF 29-51, at 6-8. Martinez' efforts to conceal his identity are "entirely consistent with efforts to avoid detection of criminal conduct," and are especially suspicious in light of the driver's atypical answers regarding his destination and the driver's refusal to tell Jackson the names of anyone else in the car.  United States v. Rice, 483 F.3d at 1085.   Moreover, Martinez' evasiveness lengthens the traffic stop's duration: around eight minutes elapse between the time when Jackson first asks Martinez his name and when Martinez reveals his true identity.  See FOF 29, at 6; FOF 51, at 8.  When "a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable."  United States v. Shareef, 100 F.3d at 1501 (citing United States v. Sharpe, 470 U.S. at 699-700 (Marshall, J., concurring)).   The Court cannot fault Jackson, therefore, "for detaining [Martinez] long enough to determine his identity."  United States v. Reynolds, 729 Fed. App'x 639, 643 (10th Cir. 2018)(unpublished).  See United States v. Morgan, 855 F.3d 1122, 1126 (10th Cir. 2017)(quoting Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 186 (2004))("'[Q]uestions concerning a suspect's identity are a routine and accepted part'" of traffic-stop investigations.).  Accordingly, the Court concludes that Jackson does not unconstitutionally prolong the traffic stop by questioning Martinez.

## IV.    MARTINEZ IS NOT IN CUSTODY PURSUANT TO <u>MIRANDA</u> WHEN JACKSON ASKS HIM IF HE HAS JUST CROSSED INTO THE UNITED STATES.

The Court concludes that Martinez is not in custody within the meaning of Miranda when Jackson asks him: "Did you just cross into the U.S.?"  FOF 48, at 8.  The test for what constitutes custody for purposes of Miranda's applicability is whether a person's freedom of action is curtailed to a degree associated with a formal arrest.  See United States v. Cash, 733 F.3d 1277 (quoting

United States v. Benard, 680 F.3d 1206, 1211 (10th Cir. 2012)).  "Persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of Miranda."  Berkemer v. McCarty, 468 U.S. at 440 (no citation for quoted material).  Accordingly, the Court evaluates whether Martinez is in custody, taking as its starting point the non-exhaustive list of factors from United States v. Jones, 523 F.3d at 1240: (i) whether police inform the suspect he may end the interview at will; (ii) whether the interview's nature creates a coercive environment from which a suspect would not feel free to leave; and (iii) whether the police dominate the encounter with the suspect.  See 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d at 1518)).

Only one part of the police encounter in this case raises the possibility of custody: Jackson's statement to Martinez when ordering him into the field, "And don't run off.  My dog is faster than two legs."  FOF 15, at 5.  If Jackson did not make this statement to Martinez, the stop would be a mere traffic stop, which, pursuant to Berkemer v. McCarty, 468 U.S. at 440, does not implicate Miranda warnings.  All that has happened so far is that Jackson has stopped a vehicle for a seat-belt violation and ordered some of the passengers out of the car, both of which, as discussed above, are Constitutional.  The question is whether Jackson's threat about his dog, and the dog's presence itself, would lead a reasonable person to conclude his freedom of action has been curtailed to the degree associated with formal arrest.

Only one of the three Jones factors weigh in favor of a finding of custody.  See United States v. Jones, 523 F.3d at 1240.  The first Jones factor cuts towards custody, because Jackson does not tell Martinez he need not answer Jackson's questions.  The second Jones factor cuts against custody.  Jackson tells Martinez: "Don't run off.  My dog is faster than two legs."  FOF 15, at 5.  When a law enforcement officer instructs a suspect not to leave and implies that a police dog will chase the suspect if he leaves, a reasonable person in the suspect's position would feel

that their freedom of movement is curtailed. Nonetheless, Jackson did not handcuff Martinez, order him to sit or lay on the ground, or place him in the back of his police car. Instead, he merely beckons him over from the field to speak with him in front of the patrol car. See FOF 25, at 5. The Court holds in a prior case that a suspect who sits in the front of a police car with the back door open and the windows down is not in custody for Miranda purposes. See United States v. Romero, 743 F.Supp. 2d at 1334. If that situation does not constitute custody, then the police dog's mere presence in the back of the car, without more, does not create "a coercive environment" when the suspect is standing outside in front of the car speaking with a police officer. United States v. Jones, 523 F.3d at 1240. Also, Jacksons' colorful language about the dog's speed is no more than an instruction not to leave, which Jackson lawfully could give. See United States v. King, 990 F.2d at 1557 (reiterating that a police officer may Constitutionally detain an individual on less than probable cause).

The final Jones factor also does not cut in favor of custody. This factor has six sub-factors, one of which cuts in favor of custody and five of which do not cut in favor of custody; the sub-factors are: (i) separating the suspect from "'family or colleagues who could offer moral support'"; (ii) isolating the suspect "'in nonpublic questioning rooms'"; (iii) the "'threatening presence of several officers'"; (iv) "'display of a weapon by an officer'"; (v) "'physical contact with the subject'"; and (vi) use of language or vocal tones "'implying that compliance with the request might be compelled.'" United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518). First, Jackson separates Martinez from the other passengers, but they are not his family or colleagues; indeed, no one in the car seems to become upset on Martinez' behalf when he is arrested, and no one volunteers to help him in any way, for example, by offering to inform his family what happened. Martinez would have felt more self-assured had he remained in the car,

in all likelihood, but the people in the car with him were probably more concerned with their own self-preservation than intervening in the encounter on his behalf.  Second, Jackson does not isolate Martinez in a private questioning room; instead, he speaks with him out in the open, in front of the patrol car, on the side of the highway, visible to the other people in the Chevy and to passing cars. Third, Jackson is the only officer present, and the police dog remains in the car throughout the encounter.  See FOF 54, at 8.  Fourth, Jackson does not brandish his weapon at any point during encounter.  Fifth, Jackson does not make physical contact with Martinez at any point during the encounter.   Sixth, Jackson uses aggressive questioning tactics during his conversation with Martinez; his tone of voice is hostile, he accuses Martinez of being paid to drive the car, and he asks him repeatedly, "Did you just cross into the U.S.?"  FOF 48, at 8.  This sub-factor, therefore, cuts slightly towards the conclusion that police dominated the encounter, but, because this sub-factor is the only one that cuts that way, the Court concludes that the Jones factors, overall, weigh against a finding of custody.  Because two of the three Jones factors weigh against a finding of custody, the Court concludes that Martinez is not in custody for Miranda purposes when Jackson asks him if he has just crossed into the United States.  Accordingly, the Court declines to suppress Martinez' statements to Jackson.

       **IT IS ORDRED** that the Defendant's Opposed Motion to Suppress, filed June 11, 2024 (Doc. 26), is denied.


                                                      _____
                                                      UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
   United States Attorney
Rumaldo R. Armijo
    Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Aric G. Elsenheimer
   Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*